**McNEILL & ASSOCIATES, INC., et al., Respondents,**

v.

**ITT LIFE INSURANCE CORPORATION, Appellant.**

**No. C7–89–279.**

Court of Appeals of Minnesota.

Oct. 3, 1989.
Review Denied Dec. 1, 1989.

William C. Mortenson, John M. Sands, William C. Mortenson Law Offices, Minneapolis, for respondents.

Kent G. Harbison, Jon C. Nuckles, Fredrikson & Byron, P.A., Minneapolis, for appellant.

Heard, considered and decided by KALITOWSKI, P.J., and PARKER and CRIPPEN, JJ.

## OPINION

PARKER, Judge.

In January 1983 appellant ITT Life Insurance Corporation (ITT) terminated respondent James McNeill's ownership of a block of insurance accounts. McNeill and his corporation, McNeill & Associates, sued for breach of contract, conversion and intentional infliction of emotional distress. After commencement of this action, ITT terminated McNeill's general agency contract with ITT. After a court trial in October 1988, the court found that ITT had breached its contract with respondents, had converted assets belonging to respondents and had wrongfully terminated McNeill's general agency. The trial court dismissed McNeill's emotional distress claim. Both parties appeal from the judgment entered on November 17, 1988. We affirm in part, reverse in part and remand.

## FACTS

James McNeill, now age 52, is the president and sole shareholder of respondent corporation, McNeill & Associates. McNeill formed the agency in 1975 for the purpose of acting as a general agent for ITT. Before creating his own agency, McNeill & Associates, McNeill was employed as an agent by Insurance Marketing, Inc. (IMI). When McNeill formed his own agency, he was a general agent under IMI; IMI was a regional director for ITT.

In 1977 Wallace Hintz, then a senior vice president for ITT, asked McNeill to purchase IMI's business, which had about ten times the number of accounts as McNeill & Associates. IMI was heavily in debt to ITT and would be either closing down or leaving Minnesota. McNeill refused to buy the business. Later in 1977, Hintz and then ITT president James Gerondale asked McNeill to service the IMI accounts. IMI was to remain the owner of the business, but ITT would pay McNeill to service the accounts. This servicing arrangement lasted for approximately two months, at which time it was terminated by the ITT home office.

Gerondale and Hintz came back to McNeill and again asked him to purchase the IMI business. This time, McNeill agreed to the purchase. The critical provisions of the purchase documents are as follows:

1. Agreement of Sale, signed December 29, 1977. The purchase price was set at $670,000.

   IMI, McNeill and ITT all signed the Agreement.

2. Addendum to Agreement of Sale, signed December 29, 1977.

   McNeill's purchase was contingent on ITT's delivery of an agreement whereby it guaranteed to hold McNeill harmless from any loss incurred through the Agreement.

   IMI, McNeill and ITT all signed the Addendum.

3. Letter from ITT to McNeill, dated January 4, 1978.

   The letter indicated that ITT approved the sale between IMI and McNeill and stated that "if business is properly serviced, ITT would be willing to reimburse McNeill & Associates any loss or losses incurred."

   The letter was signed by Hintz, vice president of ITT, and Gerondale, president of ITT.

4. Second Addendum to Agreement of Sale, dated November 2, 1978.

   The January 4, 1978 letter of consent was disavowed.

   The Agreement of Sale and First Addendum remained in effect as modified by the Second Addendum.

   The purchase price was reduced to $510,000 plus interest.

   The parties agreed to renegotiate the terms of the sale on July 20, 1980 if the commissions generated by the IMI accounts differed from the amount of commissions expected to be generated.

   The hold harmless paragraph was deleted from the First Addendum.

5. Letter from ITT dated November 2, 1978.

The letter indicated that ITT consented to IMI's sale of assets to McNeill & Associates.

McNeill warranted that he would properly service IMI's accounts.

ITT could not guarantee McNeill that he would incur no losses from the purchase.

The letter was signed by Hintz for ITT, an IMI representative, and McNeill.

The trial court permitted McNeill to testify as to the content of the conversations during which the purchase deal was made. McNeill testified that Gerondale proposed that ITT give McNeill a "hold harmless" letter guaranteeing there would be no loss to him or his agencies through the purchase of this business. McNeill said he believed Hintz's promise that "properly serviced, the business would pay for itself" within five years. No formula was used in the negotiations to determine the price of the business.

McNeill testified that one of the reasons he did not agree to the IMI purchase when first offered was because he did not want to assume the risks of the purchase and expose himself to the possibility of termination under the at-will provision of the general agency contract because of a personality conflict with an ITT official. McNeill testified that Hintz told him "there should be no reason you should be terminated, unless it was with cause." Hintz's testimony confirmed that he told McNeill he would not be terminated except for cause so long as the IMI accounts were properly serviced.

Under the Agreement of Sale, McNeill was to pay $100,000 on July 20, 1980, and $100,000 on July 20, 1981. According to a June 8, 1981, memo written by James French, an ITT senior vice president, McNeill did not make either payment. In a letter drafted by French dated June 25, 1981, French stated that McNeill had apparently not acquired title to the IMI assets yet, as he had not paid the full purchase price.

Totally independent of this activity, in early 1982 ITT sent new general agent

contracts to its general agents. McNeill signed this contract. The 1982 ITT general agent contract contained the following provision:

Otherwise, this contract shall terminate immediately upon the earliest of the following:

a. Sixty days after written notice by either party to the other, mailed to the last known address of the other party.

On January 11, 1983, French informed McNeill's attorney that McNeill owed $187,500 for the IMI deal, which included interest. The letter further advised McNeill that ITT withdrew its consent of McNeill's purchase of IMI's assets and that ITT would not release any more of the commissions to cover McNeill's costs of servicing the accounts. "Consequently, McNeill & Associates is no longer expected or permitted to service this business." On March 7, 1983, McNeill brought this action against ITT. In a letter dated October 25, 1983, McNeill's general agency was terminated, effective December 26, 1983.

A court trial began October 3, 1988, and resulted in a verdict of $340,000 for breach of contract and conversion, together with punitive damages under Minn.Stat. § 549.20 in the sum of $340,000 and an award of $860,000 for wrongful termination of the general agency. The trial court denied ITT's motion for judgment notwithstanding the verdict or a new trial.

## ISSUES

1. Did ITT's denial of McNeill's authority to service the purchased IMI accounts constitute conversion?

2. Did the trial court award excessive damages for breach of contract?

3. Did the trial court err in finding that the doctrine of promissory estoppel requires enforcement of the 1977 oral promise that McNeill would be terminated only for cause?

4. Did McNeill's evidence state a claim for intentional infliction of emotional distress?

## DISCUSSION

ITT claims the trial court made several erroneous findings of fact. This court may not reverse the trial court's finding of fact unless the finding is clearly erroneous. Minn.R.Civ.P. 52.01.

### I

ITT argues that the trial court erred by finding that ITT had converted McNeill's assets purchased from IMI. ITT maintains that its actions were at most a breach of the purchase agreement and cannot support a conversion claim.

The trial court found:

ITT deliberately and willfully converted McNeill's IMI business taking possession of it for itself without factual or legal justification and with willful indifference to the ownership rights of McNeill within the context of MSA § 549.20.

In establishing a claim for conversion, McNeill had to demonstrate that ITT converted property owned by him. *Larson v. Archer–Daniels–Midland Co.*, 226 Minn. 315, 316, 32 N.W.2d 649, 650 (1948). If McNeill acquired any property rights in IMI policies, the rights must have arisen from the general agent contract or the purchase agreement. According to the purchase agreement, McNeill received the following property interests:

(1) all rights in and to all of the in-force policies as of December 31, 1977, for life and accident and health insurance issued by ITT Life Insurance Corporation,

(2) all current insurance records, expirations and papers (not including books of account) and all of the rights, interest and property in said in-force business as of December 31, 1977, and

(3) the uncollected premiums and policies written on or before December 31, 1977.

ITT characterizes number (1) above as the commissions generated from renewals, number (2) as the customer list and "mineral rights" and number (3) as the commissions from policies in force but not paid in full.

McNeill points to no language in the general agent contract that granted him any property rights in the IMI accounts. Rather, the general agent contract states that all signed policy applications are property of ITT. Further, ITT has the power to discontinue, withdraw, change, add or modify any policies. ITT retained significant property interests in its policies.

■ A plaintiff seeking breach of contract damages is limited to "damages flowing from such breach except in exceptional cases where the defendant's breach of contract constitutes or is accompanied by an independent tort." *Wild v. Rarig*, 302 Minn. 419, 440, 234 N.W.2d 775, 789 (1975), *appeal dismissed and cert. denied*, 424 U.S. 902, 96 S.Ct. 1093, 47 L.Ed.2d 307 (1976). When the gravamen of the complaint is the breach of contract, the plaintiff may not recover tort damages. *Id.* at 441, 234 N.W.2d at 790. A bad-faith breach of contract does not become a tort. *Id.* at 442, 234 N.W.2d at 790.

All property rights in IMI accounts arise from the purchase agreement. McNeill purchased the rights to collect the commissions from the existing accounts and to use the list to sell new insurance contracts. ITT's failure to remit part of the commissions to McNeill as a service fee is a breach of the purchase agreement. Because McNeill's cause of action centers around this breach of contract, we hold that the trial court erred by finding that ITT's actions constituted conversion. As a consequence, the trial court's award of $340,000 in punitive damages under Minn.Stat. § 549.20 for conversion and willful indifference to McNeill's rights must be set aside.

## II

■ ITT argues that the trial court awarded McNeill excessive damages for the breach of the purchase agreement.

To be excessive, an award of damages must so greatly exceed what is adequate as to be accountable on no other basis than passion and prejudice.

*Kinikin v. Heupel*, 305 N.W.2d 589, 596 (Minn.1981).

The trial court found that ITT willfully breached its contract with McNeill when it withdrew consent to the IMI purchase and refused to permit him to service those accounts. While the trial court did not find damages expressly for the breach of contract, but for conversion, the court stated as a conclusion of law that McNeill was entitled to damages "for breach and conversion" in the sum of $340,000.

The court found that the value of the business was at least $340,000. ITT argues that this finding is erroneous, as McNeill's own expert testified that the value of the business was $185,000. However, throughout McNeill's expert witness' testimony on the value of the business, the witness referred solely to the income stream produced through commissions. The expert made no mention of the value of the "mineral rights" in the customer list.

■ Further, a March 3, 1982, letter from McNeill's attorney to James French of ITT urging renegotiation of the purchase price indicates that McNeill believed the value of the business was approximately $340,000. The owner of property is presumed to be acquainted with its value and may testify to its value. *Lehman v. Hansord Pontiac Co.*, 246 Minn. 1, 6, 74 N.W.2d 305, 309 (1955). Because the expert's valuation did not include a value for mineral rights and McNeill valued the business at approximately $340,000, we cannot say the trial court's award of damages for breach of contract was clearly erroneous.

## III

ITT claims the trial court erred in finding that it had wrongfully terminated McNeill's general agency contract. The trial court made the following findings:

Finding 7.2. [T]he parties mutually agreed to modify the General Agent contracts in consideration of the Plaintiffs assuming the IMI business. The Defendant clearly guaranteed the Plaintiff he would not be terminated except "for cause" in order to induce the acceptance of the IMI block and to give him reasonable protection in the face of the substantial obligation he was undertaking.

Finding 7.9. [T]he parties explicitly agreed and implicitly intended to modify the 30 day termination clause of the General Agent contracts, except for cause, and that McNeill relied upon and performed upon this reliance thereby estopping Defendant from asserting a right to terminate McNeill without cause.

### Admission of Parol Evidence to Modify the Purchase Documents

◼ The parol evidence rule prohibits the admission of evidence of oral discussions prior to or contemporaneous with a written agreement if the evidence contradicts a term of the written agreement. *Material Movers, Inc. v. Hill*, 316 N.W.2d 13, 17 (Minn.1982). The trial court must decide whether a contract is completely integrated and therefore subject to the parol evidence rule. *Taylor v. More*, 195 Minn. 448, 454–55, 263 N.W. 537, 540 (1935) (cited by *United Artists Communications v. Corporate Property Investors*, 410 N.W.2d 39, 41–42 (Minn.Ct.App.1987)).

If [the written contract] imports on its face to be a complete expression of the whole agreement—that is, contains such language as imports a complete legal obligation, it is to be presumed that the parties here introduced into it every material item and term * * *.

*Taylor*, 195 Minn. at 453, 263 N.W. at 539.

In the present case, the second addendum to the agreement of sale expressly states:

The Agreement dated December 21, 1977, the Addendum dated December 29, 1977, this Addendum and a letter of consent from ITT LIFE of even date, a copy of which is attached and incorporated herein by reference, constitute the entire agreements and understandings of the parties.

The documents made no mention of the oral termination agreement.

However, in the memorandum accompanying its findings, the trial court describes the IMI buyout agreement as "a maze of additions and deletions." The court pointed out that the documents contained no method to compute the final price. The trial court's determination appears to have been that the IMI documents were not entirely integrated and that therefore parol evidence should be admitted to show the oral agreement to be part of the IMI purchase.

Hintz's oral representation that McNeill would not be terminated but for cause modified the prior general agency contract. An oral agreement may modify a prior written contract which is outside the statute of frauds. *Mitchell v. Rende*, 225 Minn. 145, 148, 30 N.W.2d 27, 30 (1947) (cited by *Reliable Metal v. Shakopee Valley Printing*, 407 N.W.2d 684, 687 (Minn.Ct.App.1987)).

### Promissory Estoppel Theory

◼ The doctrine of promissory estoppel is applicable when (1) a promise has been made; (2) the promisor should have reasonably expected the promise to induce action by the promisee; (3) the promisee does in fact act; and (4) justice requires enforcement of the promise. *Grouse v. Group Health Plan, Inc.*, 306 N.W.2d 114, 116 (Minn.1981).

◼ Applying these four factors to the present case, promissory estoppel appears to be appropriate. The trial court found that Hintz had promised McNeill he would not be terminated but for cause. This finding is supported by McNeill's and Hintz's testimony. Hintz's testimony indicated that he intended McNeill to buy the IMI accounts and his employment promise was an inducement to do so. McNeill's testimony indicated he relied on the promise in making the purchase. McNeill's liabilities and responsibilities incurred by purchasing a business with ten times the number of his own accounts indicate that justice will be served by applying promissory estoppel.

Further, McNeill had little practical choice but to sign the 1982 contract. The purpose of the 1982 written agency contracts, according to McNeill's testimony, was to change the commission rates. McNeill testified that he was reluctant to sign the new contracts because "we were on an on-going basis with the purchase price, and the purchase of that business,"

the payments for which were tied to McNeill's commissions. McNeill received a letter from Robert Miller of ITT stating:

We are taking the position that anyone who has not returned the revised contracts within that time, being thirty days, is no longer interested in representing ITT Life.

The doctrine of promissory estoppel applies in the present case. We affirm the trial court's finding that ITT is estopped from denying its agreement not to terminate McNeill's general agency but for cause.

*Damages Awarded for the Termination of McNeill's General Agency Contract*

■ The trial court based its damage award on the expert's calculation of lost profits from the time of McNeill's termination up to trial. The court found that McNeill lost at least $575,000 in past profits and at least $285,000 in profits over the next five to fifteen years.

ITT contends that the expert's projections were erroneous as based on false assumptions. However, ITT had the opportunity to cross-examine the witness and to offer its own expert testimony on the value of McNeill's losses. ITT supplied no alternative figures. The trial court based its findings on the expert's testimony and ITT's cross-examination. It did not clearly err by adopting the expert's lowest estimated value; its findings are based on sufficient evidence.

## IV

■ Respondents argue that the trial court erred by dismissing the claim for damages for emotional distress endured by McNeill and caused by ITT's actions. The trial court found that ITT's actions did not meet the "particularly egregious conduct" standard of *Hubbard v. United Press International, Inc.*, 330 N.W.2d 428 (Minn. 1983).

McNeill contends that his emotional distress claim does not arise under *Hubbard*, but *Potthoff v. Jefferson Lines, Inc.*, 363 N.W.2d 771 (Minn.Ct.App.1985). In *Potthoff* this court stated that emotional dis-

tress could be a "natural result of *interference with contract relations*. Therefore, in appropriate cases emotional distress damages are recoverable in this type of action." *Potthoff*, 363 N.W.2d at 777 (emphasis added). However, the facts of *Potthoff* differ greatly from those of the present case. In *Potthoff* the defendant ordered the plaintiff's employer to fire him. Here the trial court did not address McNeill's claim for interference with contractual relations. We refuse to expand *Potthoff* beyond its facts to apply it to a case wherein the alleged independent tort is conversion, because the damages caused the alleged conversion were the same damages caused by the breach of contract.

## DECISION

The trial court erred in finding that ITT's actions constituted conversion; as a consequence, the award of punitive damages for the conversion cannot stand.

The trial court did not err in awarding $340,000 in damages for ITT's breach of the purchase agreement, nor did the court err in applying the doctrine of promissory estoppel to find that ITT wrongfully terminated McNeill's general agency contract. The trial court's award of $860,000 in damages was based on sufficient evidence. We affirm the trial court's dismissal of McNeill's claim for intentional infliction of emotional distress.

We remand for entry of judgment in accordance with this opinion and for calculation of interest and costs thereon.

Affirmed in part, reversed in part and remanded.