**Ruth Ann Spencer HANKS, Respondent,**

v.

**HUBBARD BROADCASTING, INC., Appellant.**

No. C8–92–558.

Court of Appeals of Minnesota,

Dec. 8, 1992.

Review Denied Feb. 12, 1993.

Walter E. Diercks, Rubin, Winston, Diercks, Harris & Cooke, Washington, D.C., Rebecca Palmer, Maslon Edelman Borman & Brand, Minneapolis, for respondent.

Robert Lewis Barrows, Leonard, Street & Deinard, P.A., Minneapolis, for appellant.

Considered and decided by AMUNDSON, P.J., and LANSING and PETERSON, JJ.

## OPINION

AMUNDSON, Judge.

Appellant Hubbard Broadcasting, Inc. challenges the jury verdict awarding respondent Ruth Ann Spencer Hanks $82,603 in compensatory damages for intentional misrepresentation and $300,000 in punitive damages. We affirm.

## FACTS

In July 1985, respondent Ruth Ann Spencer Hanks (Spencer) began working as a television news anchor at KSTP–TV, owned by appellant Hubbard Broadcasting, Inc. (HBI). On July 10, 1986, Spencer signed a new three year contract extending her employment through June 30, 1989. The last year of the contract provided Spencer would earn $150,000.

This new contract also contained a "window" period from July 1, 1988 to June 30, 1989, allowing Spencer to leave during the last year of the contract if she received a written offer from a network affiliate (ABC, CBS or NBC) or from a station in

one of the ten largest television markets (a "top ten" market), subject to HBI's right to meet the offer. The contract was silent on whether HBI would promote Spencer or whether Spencer would be given "co-equal" status with any other anchor.

On March 16, 1987 HBI decided to replace Spencer's co-anchor, Stan Turner, and a search began for his replacement. Spencer expressed concern to various managers about the lack of promotional activities that included her. HBI officials told Spencer that it would not promote the Spencer/Turner news team because Turner was going to be replaced. Stanley Hubbard, chief executive officer of HBI, told Spencer in March 1987 that when Turner's replacement was accepted by the viewers, more extensive promotions of the news team could begin.

In July 1987, Spencer approached Robert Regalbuto, then the general manager of KSTP–TV, to talk about the level of promotional activity. According to Spencer, Regalbuto told her he had a plan to do an extraordinary promotional "blitz" of the new team in May 1988, "unlike any you have seen," after Turner's replacement had been accepted. By May 1988, Turner's replacement had not been hired, and HBI was not implementing a promotional campaign to the extent Spencer expected.

Mendes Napoli joined HBI as Vice President of News in January 1988. Spencer met with Napoli in February 1988 and expressed concern about the level of promotional activity. Napoli assured Spencer that he was looking for an anchor "to go with her" and that a vigorous promotional campaign would be put into action as soon as the new anchor team was in place.

In April 1988, Spencer told Napoli she had hired an agent, Pam Pulner, as a safety net in case the new anchor team was not accepted. Pulner sent a tape of Spencer's work to KNBC in Los Angeles, the number two market in the United States. Pulner testified that KNBC expressed interest in Spencer.[1] Spencer, however, testified that

in reliance upon the representations made by HBI management, she told Pulner not to pursue this opportunity or any other opportunities. Pulner further testified that she encouraged Spencer to look for a new position while she was at KSTP–TV but Spencer refused, believing the representations of HBI officials.

A new co-anchor, Randall Carlisle, was hired and began appearing with Spencer in September 1988. Spencer contends that prior to the arrival of Carlisle, KSTP–TV used its co-anchors on a roughly equal basis. After Carlisle was hired, however, Spencer asserts the format of the news program was changed "radically." Spencer testified that HBI began implementing a decision to make Carlisle the leader of the anchor team and to reduce her to a secondary role.

After Carlisle was hired, the pre-recorded opening of the newscast did not include Spencer. Additionally, where Turner and Spencer had alternated opening the newscast, Carlisle always opened the show and usually read the first story as well. Spencer testified she would not appear until well into the broadcast and without any introduction. Spencer and Turner also alternated reading "teases," a description of an upcoming story designed to hold viewer attention. Spencer asserts that once Carlisle appeared he read all the teases. In spite of these format changes, HBI officials testified they planned to make Spencer as big a star as possible.

Former executive producer Gloria McDonough testified that Carlisle was being positioned as the lead anchor because he was the stronger anchor. She saw this positioning as part of the "big picture," and that certain techniques were used, such as having anchors read certain stories, to build a public perception of the anchor.

Former KSTP–TV news director Larry Price testified that HBI's consultant, Frank Magid told him that a news show should have a lead anchor and it should be a male. Former KSTP–TV anchor Ron Magers tes-

---

**1.** This testimony was admitted over HBI's hearsay objection. The statement was not received for the truth that KNBC had any interest in Spencer but rather only that Pulner reported the statement to Spencer.

tified that Magid once stated that he would like the role of the male and female anchors to be equal, but "the male should be the first among equals."

Spencer testified she was never told of this decision to reduce her role. Spencer claims that Regalbuto and Napoli repeatedly told her their strategy was only to introduce Carlisle into the market and there was no intention to reduce her role as an equal co-anchor. HBI contends that it learned to be cautious and not to promote a new anchor or team before it had been accepted by the viewing public. HBI asserts it could be more harmful to promote a new team prematurely than to delay the promotion and that a new anchor's introduction must be carefully engineered to prevent viewer backlash.

Spencer asserts that had she been told the truth about management's decision to make Carlisle the leader of the anchor team, she would have instructed her agent to seek a position for her in a top ten market and would have exercised her contractual right to leave KSTP–TV.

On February 24, 1989, Napoli had scheduled a meeting with Spencer. By this time, Spencer had concluded Napoli was lying to her. Spencer testified she assumed Napoli was going to fire her at the meeting. Spencer met with Napoli in his office and secretly recorded the meeting upon the advice of her former attorney. During the course of the meeting, Spencer revealed she was taping the meeting. Spencer was immediately taken off the air. On February 25, 1989, Napoli wrote Spencer a letter relieving her of her duties at KSTP–TV, purportedly for having secretly tape recorded the meeting.[2] Spencer was paid the remaining compensation due to her under the contract.

Spencer was out of work from July 1989 to March 1990 when she obtained a "number two" and "less prestigious" weekday anchor position at WDIV–TV in Detroit for less money than she was receiving at KSTP–TV. Spencer earns $125,000 annually at the Detroit station. Pulner testified the taping incident did not prevent her from obtaining a position for Spencer sooner, but that it takes a considerable amount of time to move an anchor into a new position in a larger market. Pulner also believed the reduction in Spencer's role made the job search more difficult.

Spencer commenced this action on March 14, 1989. In her first amended complaint, Spencer sought damages for breach of contract, promissory estoppel, breach of an implied covenant of honesty and loyalty, breach of an implied covenant of good faith and fair dealing, negligent misrepresentation and intentional misrepresentation. She also gave notice of her intent to seek leave to amend the complaint to request punitive damages.

On June 11, 1991, the trial court granted HBI summary judgment on Spencer's claims for breach of contract, promissory estoppel, breach of an implied covenant of honesty and loyalty and breach of implied covenant of good faith and fair dealing. The trial court also granted Spencer leave to amend her complaint to request punitive damages.

The case proceeded for a jury trial beginning January 6, 1992 on Spencer's intentional misrepresentation, negligent misrepresentation and punitive damages claims. Spencer's main argument was that she incurred damages by relying on the false statements of her supervisors that she would be heavily promoted. Spencer contended the lack of promotion and the reduction in her role as an anchor hindered her ability to get a new anchor job.

The jury returned a special verdict on January 15, 1992, awarding Spencer $82,-603 in compensatory damages for intentional misrepresentation. The jury specifically found that HBI made false representations of material facts to Spencer in regard to having a plan to extraordinarily promote her as an anchor, or in regard to HBI

---

**2.** Spencer makes allegation that Napoli himself secretly taped recorded meetings with KSTP–TV employees prior to February 24, 1989. Former investigative producer Janell Gabor testified Na-poli covertly taped a meeting she attended in March or April 1988, and another meeting in October 1988.

having no intention to reduce her role as a co-equal anchor. The jury further found these false representations were made with the fraudulent intent of deceiving Spencer, they were made to induce her to act upon the representations, and Spencer relied and acted upon such representations. The jury found the false representations were not made negligently.

On January 16, 1992 the jury returned a verdict awarding Spencer $300,000 in punitive damages. The jury determined the actions of HBI showed a willful indifference of Spencer's rights.

The trial court entered its Order for Judgment on Special Verdict on January 21, 1992. The trial court denied HBI's motion for judgment notwithstanding the verdict, or, in the alternative, for a new trial, on March 2, 1992. Judgment was entered on March 11, 1992 and this appeal followed.

## ISSUES

1. May Spencer recover tort damages for intentional misrepresentation where the trial court previously determined the alleged misrepresentations could not support a claim for breach of contract?

2. Is the evidence sufficient to sustain the jury's determination that HBI made intentional misrepresentations to Spencer upon which she justifiably relied?

3. Is the evidence sufficient to sustain the $82,603 compensatory damages award to Spencer for intentional misrepresentation?

4. Is the evidence sufficient to sustain the $300,000 punitive damages award to Spencer?

## ANALYSIS

I. *Tort Recovery*

Spencer asserted in her complaint that HBI breached the employment contract by not promoting her. The trial court granted HBI partial summary judgment on this claim stating in its memorandum that the contract does not contain any language which creates a duty to promote Spencer.

The trial court also rejected Spencer's argument that HBI breached an oral modification of the contract, finding that the statements of Regalbuto and Napoli were statements of intention or mere policy statements which were not enforceable oral modifications of the written contract.

HBI contends that to permit the recovery of tort damages on the basis of conversations that did not rise to the level necessary to permit a contract claim, would improperly transform a deficient contract claim into a fraud claim. We disagree.

■ This issue is a question of law. A reviewing court is not bound by and need not give deference to a trial court's determination of a purely legal question. *Frost–Benco Elec. Ass'n v. Minnesota Pub. Utils. Comm'n,* 358 N.W.2d 639, 642 (Minn.1984). The appellate court conducts an independent review of the record in light of the relevant law to determine if the lower court made the proper legal conclusion. *See Jadwin v. Minneapolis Star & Tribune Co.,* 367 N.W.2d 476, 483 (Minn. 1985).

■ We agree with HBI's argument that a contract claim should not be converted into a tort claim. *See, e.g., Lesmeister v. Dilly,* 330 N.W.2d 95, 102 (Minn.1983) (where the duties arose out of contracts, it was error to submit the theory of "negligent breach" of contract to the jury); *Wild v. Rarig,* 302 Minn. 419, 442, 234 N.W.2d 775, 790 (1975) ("[a] malicious or bad-faith motive in breaching a contract does not convert a contract action into a tort action"), *cert. denied,* 424 U.S. 902, 96 S.Ct. 1093, 47 L.Ed.2d 307 (1976); *McNeill & Assocs. v. ITT Life Ins. Corp.,* 446 N.W.2d 181, 185 (Minn.App.1989) ("[A] bad-faith breach of contract does not become a tort"), *pet. for rev. denied* (Minn. Dec. 1, 1989).

■ Allowing the fraud finding to stand in this case, however, does not impermissibly expand a contract claim into a tort claim. Extra-contract damages are recoverable when there is an independent tort. The supreme court has stated:

We are of the opinion that when a plaintiff seeks to recover damages for an alleged breach of contract he is limited to damages flowing only from such breach *except in exceptional cases where the defendants breach of contract constitutes or is accompanied by an independent tort.*

*Wild,* 302 Minn. at 440, 234 N.W.2d at 789 (emphasis added).

■ This court has recognized that a plaintiff can raise two independent causes of action: fraud in the inducement to the contract and breach of the employment contract. *Brooks v. Doherty, Rumble & Butler,* 481 N.W.2d 120, 128 (Minn.App. 1992) *pet. for rev. denied* (Minn. Apr. 29, 1992). To recover under theories of both contract and tort, a plaintiff must prove separate damages for fraud and for breach. *Id.*

■ Thus it is clear under Minnesota law that a party may properly recover under a breach of contract and fraud theory in an employment context. The issue becomes whether there is a breach of duty which is distinct from the breach of contract. The breach of an employment contract does not give rise to a tort claim where "the breach of duty is indistinguishable from the breach of contract." *Lopus v. L & L Shop–Rite, Inc.,* 171 Mich.App. 486, 430 N.W.2d 757, 760 (1988), *lv. den.* (Mich. Oct. 31, 1988). The test is whether a relationship would exist which would give rise to the legal duty without enforcement of the contract promise itself. *Brewster v. Martin Marietta Aluminum Sales, Inc.,* 145 Mich.App. 641, 378 N.W.2d 558, 569 (1985).

This reasoning is also in accord with Wisconsin courts. In *Dvorak v. Pluswood Wisconsin, Inc.,* 121 Wis.2d 218, 358 N.W.2d 544 (App.1984), an employee brought a wrongful termination case against his employer. The Wisconsin Court of Appeals stated:

In order for such a cause of action in tort to exist, a duty must exist independently of the performance of the contract. According to this test, the existence of a contract is ignored when determining whether alleged misconduct is actionable in tort.

*Id.* 358 N.W.2d at 545 (citing *Landwehr v. Citizens Trust Co.,* 110 Wis.2d 716, 329 N.W.2d 411, 414 (1983)).

■ Similarly, this case goes beyond a mere breach of contract claim. Spencer's employment contract was silent in regard to whether HBI would promote her or whether her role would be reduced in comparison to her co-anchor. Thus the representations made to Spencer are not contract related, even though the original relationship arose pursuant to a contract. Even if Spencer was an at-will employee she could have pursued a claim for intentional misrepresentation based upon the representations made to her. Therefore Spencer's tort recovery is clearly distinguishable from any recovery in a breach of contract action. Accordingly, the trial court properly allowed the intentional misrepresentation claim to go to the jury.

## II. *Intentional Misrepresentation*

HBI argues Spencer did not establish any of the elements of intentional misrepresentation. We disagree.

■ The elements of intentional misrepresentation are well-established. To establish a claim, a plaintiff must show (1) there was a representation; (2) the representation was false; (3) the representation had to do with a past or present fact; (4) the fact was material; (5) the fact was susceptible of knowledge; (6) the representor knew the represented fact to be false, or, in the alternative, asserted it as his or her own knowledge without knowing whether it was true or false; (7) the representor intended to have the other person induced to act or justified in acting upon it; (8) that person was so induced to act or so justified in acting; (9) that person's action was in reliance upon the representation; (10) that person suffered damage; and (11) the damage was attributable to the misrepresentation. *Weise v. Red Owl Stores, Inc.,* 286 Minn. 199, 202–03, 175 N.W.2d 184, 187 (1970).

The two main alleged misrepresentations that went to the jury were: (1) HBI had a

plan to extraordinarily promote Spencer and the new team; and (2) HBI did not intend to reduce Spencer's role below that of her male counterpart. HBI asserts these statements to Spencer were only statements of intention or mere policy statements and that Spencer presented no evidence the statements were false or that it did not intend to do what it said.

The jury replied "yes" to the following special verdict questions:

Did the defendant make any false representations to plaintiff of a past or present material fact in regard to defendant's having a plan to extraordinarily promote her as an anchor for KSTP–TV or in regard to defendant's having no intention to reduce plaintiff's role as a co-equal anchor with her male counterpart?

Was the false representation of fact you found defendant made to plaintiff made by defendant with the fraudulent intent of deceiving plaintiff?

Was the false representation of fact you found defendant made to plaintiff made by defendant with intent to induce plaintiff to act upon that representation?

Was plaintiff induced to act upon defendant's false representation and did she rely and act upon it?

■■■ On review, answers to special verdict questions will not be set aside unless they are perverse and palpably contrary to the evidence or where the evidence is so clear to leave no room for differences among reasonable people. *Karnes v. Milo Beauty & Barber Supply Co.*, 441 N.W.2d 565, 567 (Minn.App.1989), *pet. for rev. denied* (Minn. Aug. 15, 1989). The evidence must be viewed in a light most favorable to the jury verdict. *Id.* If the jury's special verdict finding can be reconciled on any theory, the verdict will not be disturbed. *Travelers Ins. Co. v. Horseshoe Lake Farms, Inc.*, 456 N.W.2d 453, 459 (Minn. App.1990).

■■■ Viewing the evidence in a light most favorable to Spencer, there is no basis for us to reverse the special verdict findings of the jury. First, the jury could reasonably find that the statements of HBI managers went well beyond statements of intent, i.e. HBI's representation that it already had a plan to promote Spencer and her new co-anchor was a statement of objective fact, not just a statement of future intention.

■■■ Second, the jury could reasonably have found HBI managers falsely represented that Carlisle was the lead anchor on only a temporary basis to introduce him to the market. This finding is supported by evidence that prior to Carlisle's arrival, Spencer was a co-equal anchor with Stan Turner. But when the Spencer/Carlisle team began, Spencer's role was systematically reduced in an attempt to make Carlisle the leader of the anchor team.

■■■ HBI also argues that Spencer's actions did not constitute legal reliance. We disagree.

Spencer testified at trial that she gave up her "window" in reliance upon what she was being told by HBI managers. The evidence shows Spencer repeatedly rejected her agent's advice to look for a position in a top ten market, withdrew from consideration for an anchor position at KNBC in Los Angeles, and did not seek a new position on her own.

■■■ We recognize that where an at-will employee merely continues to work and does not claim to have turned down any offers of employment based upon an employer's representations, no reliance will be found. *See Dumas v. Kessler & Maguire Funeral Home, Inc.*, 380 N.W.2d 544, 548 (Minn.App.1986).

The present case, however, involves the question of what would be sufficient reliance in the context of a fraud claim, where someone like Spencer, gave up a written contractual right to leave her job before the expiration of the employment contract. HBI ignores the fact it fraudulently induced Spencer to give up her specially negotiated contractual window. Because of the unique nature of the news industry, and the fact she was working pursuant to a contract, this case is different than the at-will employment cases. There is sufficient evidence to show Spencer did not pursue

her contractual window in reliance upon Hubbard Broadcasting's representations.

 Additionally, the employment contract does not bar a finding of legal reliance. The contract did not contradict the representations made to Spencer because the contract was silent on the subjects covered by the misrepresentations. When a promise is not in plain contradiction of a contract, the question of legal reliance is for the trier of fact. *Veit v. Anderson*, 428 N.W.2d 429, 433 (Minn.App. 1988). Moreover, a full integration clause does not prevent proof of fraudulent representations by a party to a contract. *Johnson Bldg. Co. v. River Bluff Development Co.*, 374 N.W.2d 187, 193 (Minn.App.1985), *pet. for rev. denied* (Nov. 18, 1985).

 HBI further argues that even if Spencer can show legal reliance, such reliance was unjustified. We disagree. Whether Spencer's reliance was reasonable under the circumstances was an issue of fact for the jury to decide. The jury could reasonably determine that Spencer continued to believe HBI managers despite their prior misstatements of fact.

The essence of HBI's argument is that it does not agree with the jury's factual determinations. We conclude, however, the jury's findings are supported by the evidence. Accordingly we affirm the jury's special verdict that Spencer justifiably acted in reliance upon HBI's false representations.

### III. *Compensatory Damages*

The jury determined Spencer sustained $82,603 in damages directly caused by HBI's false representations. HBI argues the award must be reversed because Spencer did not suffer any out-of-pocket damages and Spencer's alleged losses under the benefit of the bargain exception are totally speculative and not recoverable. We disagree.

 In reviewing the sufficiency of a damage award, the evidence must be considered in a light most favorable to the verdict. *Rayford v. Metropolitan Transit Comm'n*, 379 N.W.2d 161, 165 (Minn.App.

1985), *pet. for rev. denied* (Minn. Feb. 14, 1986). A reviewing court will not interfere with a jury's award of damages "unless its failure to do so would be shocking or would result in plain injustice." *Hughes v. Sinclair Mktg., Inc.*, 389 N.W.2d 194, 199 (Minn.1986).

Generally damages arising from fraud and misrepresentation should be measured by the plaintiff's out of pocket loss. *B.F. Goodrich Co. v. Mesabi Tire Co.*, 430 N.W.2d 180, 182 (Minn.1988). The rule does not work well, however, where a "defendant's misrepresentation prevents plaintiff from taking measures to protect the value of the property it already has." *Id.* at 183. In such a case, courts have carved out an exception to the out-of-pocket rule in order to restore the plaintiff to his or her former status in life.

In *Brooks* this court determined the out-of-pocket rule would not compensate an attorney for the fraud which damaged him beyond any loss he suffered from the breach of contract. *Brooks*, 481 N.W.2d at 129. Thus this court determined Brooks was entitled to recover his economic loss from the destruction of his business, i.e. his career as an attorney, measured by the difference between value of his career before the misrepresentation and its value after the misrepresentation. *See id.*

 We conclude the limited exception to the out-of-pocket rule is applicable and that Spencer's losses are not too speculative to be recovered. Where the out-of-pocket rule does not apply, the plaintiff may recover for any injury which is the direct and natural consequence of having acted on the faith of defendant's representations. *See Lewis v. Citizens Agency of Madelia, Inc.*, 306 Minn. 194, 201, 235 N.W.2d 831, 835 (1975).

This case is analogous to *Brooks*. Spencer's "business" was her career as a news anchor, just like Brooks business was his career as an attorney. Spencer supplied the jury with evidence regarding her salary at KSTP–TV, the length of time she was unemployed, and her lower salary in Detroit. Additionally there was testimony

regarding the way HBI reduced Spencer's role, damaging her ability to get another job. Thus there is no basis to reject the jury's verdict. There is competent evidence to show that Spencer suffered damages as a natural consequence of HBI's intentional misrepresentations. Accordingly, we affirm the award of compensatory damages.

## IV. *Punitive Damages*

 HBI argues the evidence is insufficient to sustain the $300,000 punitive damages award. We disagree.

The award of punitive damages in this case is governed by Minn.Stat. § 549.20, subd. 1 (1988)[3] which provides:

> Punitive damages shall be allowed in a civil action only upon clear and convincing evidence that the acts of the defendant show a *willful indifference to the rights or safety of others.*

*Id.* at subd. 1 (emphasis added). Subd. 3 further provides:

> Any award of punitive damages shall be measured by those factors which justly bear upon the purpose of punitive damages, including the seriousness of the hazard to the public arising from the defendant's misconduct, the profitability of the misconduct to the defendant, the duration of the conduct and any concealment of it, the degree of the defendant's awareness of the hazard and of its excessiveness, the attitude and conduct of the defendant upon discovery of the misconduct, the number and level of employees involved in causing or concealing the misconduct, the financial condition of the defendant, and the total effect of other punishment likely to be imposed upon the defendant as a result of the misconduct, including compensatory and punitive damage awards to the plaintiff and other similarly situated persons, and the severity of any criminal penalty to which the defendant may be subject.

The purpose of punitive damages is to punish the defendant and deter the conduct found to be willfully indifferent to the safety of others. *Hodder v. Goodyear Tire & Rubber Co.,* 426 N.W.2d 826, 837 (Minn. 1988), *cert. denied,* 492 U.S. 926, 109 S.Ct. 3265, 106 L.Ed.2d 610 (1989). "Willful indifference" does not imply a purpose of actually intending to harm the plaintiff, but a malicious, reckless or knowing disregard of the plaintiff's rights or safety. *Wirig v. Kinney Shoe Corp.,* 461 N.W.2d 374, 381 (Minn.1990).

The amount of punitive damages to award is almost exclusively within the province of the jury. *Stuempges v. Parke, Davis & Co.,* 297 N.W.2d 252, 259 (Minn. 1980). Since the trial court has the significant advantage of viewing the entire proceeding, some of which is not apparent on the record, an appellate court should not interfere with the trial court's decision regarding remittitur unless there is a clear abuse of discretion. *Caspersen v. Webber,* 298 Minn. 93, 100, 213 N.W.2d 327, 331 (1973).

The award of punitive damages is proper and fully supported by the evidence. The jury determined, and the evidence supports that HBI intentionally misrepresented certain important facts to Spencer, that she reasonably relied upon these misrepresentations and that she was injured as a result. Specifically, the evidence when viewed in a light most favorable to Spencer, shows HBI told Spencer there existed a promotional "blitz" of her, even though no such plan existed. The evidence also shows that Spencer was falsely told the format changes, which reduced her role and damaged her credibility and ability to find another job, were temporary. These misrepresentations induced Spencer into staying at KSTP–TV and not taking advantage of her contractual window.

We conclude that when all the factors in Minn.Stat. § 549.20, subd. 3 are considered, $300,000 in punitive damages is not exces-

---

**3.** Section 549.20, subdivision 1 was amended in 1990 to require a defendant's acts to show "deliberate disregard for the rights or safety of others." This amendment, however, applies only to causes of action arising on or after May 4, 1990. 1990 Minn.Laws ch. 555, § 24. Therefore the heightened standard does not apply to this case.

sive. Accordingly, we affirm the award of punitive damages to Spencer.

### DECISION

The trial court properly determined Spencer could recover in tort for intentional misrepresentation, even though the evidence would not support a breach of contract action. Additionally, we affirm the jury verdict findings that HBI made false representations with the fraudulent intent of deceiving Spencer and that Spencer justifiably relied and acted upon such representations. We also affirm the awards of compensatory and punitive damages to Spencer.

Affirmed.