**WESSELS, ARNOLD & HENDERSON,**
Appellee,

v.

**NATIONAL MEDICAL WASTE,**
**INC., Appellant.**

**No. 94–3331MN.**

United States Court of Appeals,
Eighth Circuit.

Submitted May 19, 1995.

Decided Sept. 7, 1995.

William F. Mohrman, Minneapolis, MN, argued, for appellant.

Therese M. Marso, St. Paul, MN, argued (Darron C. Knutson and Brooks F. Poley, St. Paul, MN, on the brief), for appellee.

Before MORRIS S. ARNOLD, ROSS, and WOOD, JR.* Circuit Judges.

HARLINGTON WOOD, JR., Circuit Judge.

National Medical Waste [National], defendant-appellant, appeals the district court's [1] grant of summary judgment in favor of Wessels, Arnold & Henderson [Wessels], plaintiff-appellee. Wessels claimed that it had a contract with National to render a fairness opinion on a potential merger National was considering. The merger did not occur and National argued that payment was conditioned on its effectuation. The district court found payment was not conditioned upon the completion of the potential merger and Wessels had performed in accordance with the contract. National appeals.

## I.

Wessels is an investment banking firm in Minneapolis, Minnesota. National is a Delaware corporation with its principal place of

---

* The Honorable Harlington Wood, Jr., Circuit Judge, United States Court of Appeals, Seventh Circuit, sitting by designation.

1. The Honorable James M. Rosenbaum, United States District Judge for the District of Minnesota, Fourth Division.

business in Nashville, Tennessee, and is in the business of recycling medical waste. At the time of the transaction involved, National was a publicly traded corporation with five shareholders. In early 1992, Michael Kessler [Kessler], a partner at Wessels, and John Pappajohn [Pappajohn], a director and shareholder of National, discussed recruiting Kessler's expertise on a potential merger National was considering. Both parties dispute who initiated the business relationship at this point. Pappajohn was familiar with Kessler through Kessler's prior employment with Smith Barney in New York.

As a result of this phone call, Kessler drafted a proposed engagement letter regarding the services that Wessels could provide and forwarded the letter to Oren Embry [Embry], president of National and its Board of Directors. National replied with its own engagement letter, including numerous substantive changes. Included among the proposed changes was a provision requiring that Tennessee law govern the contract. Negotiations continued between Kessler and Embry concerning the terms of the agreement and it was resolved that Minnesota law would govern the contract. On July 29, 1992, the final letter agreement was executed between the parties. The contract obligations were as follows:

 (a) Wessels would undertake a due diligence investigation of National;

 (b) Wessels would assist and advise National as to the pricing, form, and structure of the merger;

 (c) Wessels would render a "fairness opinion" of the proposed merger;

 (d) Wessels would meet with National's Board of Directors and present and review facts supporting the conclusion reached; and

 (e) Wessels would provide "other financial advisory and investment services" as National may request.

In return, National agreed to pay:

 (a) A retainer fee in the amount of $50,000 payable upon the execution of this engagement letter; and

 (b) A financial advisory fee of $200,000 payable within 20 business days from the delivery of the opinion (whether verbal or written) to the Board of Directors of National. If a verbal opinion is delivered, then Wessels will furnish a written opinion as soon as possible thereafter. The retainer fee will be credited against the financial advisory fee.

In addition, National agreed to indemnify Wessels and reimburse it for expenses incurred up to $20,000. It was also conceded that the contract could only be amended or modified in writing.

It is not disputed that National paid Wessels the $50,000 retainer fee when the letter was executed or that Wessels performed all of its obligations specified in the contract to National's satisfaction by September 1992. Ultimately, National decided not to proceed with the merger. Wessels submitted its invoice requesting a total payment of $167,268.57.[2]

While the bill remained outstanding, National continued to contact Kessler. In October 1992, Embry called Kessler seeking suggestions of other firms which provide asset appraisal valuations. Pappajohn also visited Kessler in Minnesota on two occasions to discuss the outstanding bill. In June 1993, Wessels filed its complaint against National alleging breach of contract. National denied that it owed Wessels payment for its service alleging payment was conditioned on completion of the merger, which was never consummated.

National initially filed a motion to dismiss for lack of personal jurisdiction. The district court denied the motion, finding that there were sufficient minimum contacts. The district court found that Pappajohn contacted Kessler and actively pursued a business relationship with Wessels. In response to National's argument that Pappajohn had acted without authority, the court found that the

---

2. The total judgment of $167,268.56 is the $200,000 financial advisory fee, less the $50,000 retainer fee already paid, plus $17,268.56 in expenses, which National has agreed are reasonable.

director's action had been ratified and supported by National.

Wessels moved for summary judgment and the district court granted Wessels' motion. The court found that the July 29, 1992, letter was a complete integration of the parties' contractual agreement. The district court further held that the completion of the merger was not a condition precedent to National's obligation to pay on the grounds that it was contrary to the plain language of the agreement. National appeals, and we affirm.

## II.

We review a grant of summary judgment by considering all factual issues in the light most favorable to the nonmoving party (herein National) and determining *de novo* whether there was no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Bathke v. Casey's General Stores, Inc.,* 64 F.3d 340, 342–43 (8th Cir.1995) (citing *Willman v. Heartland Hosp. E.,* 34 F.3d 605, 609 (8th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1361, 131 L.Ed.2d 218 (1995)). Summary judgment is not appropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). With regard to the district court's denial of National's motion to dismiss for lack of personal jurisdiction, we examine *de novo* the question whether the plaintiff has established a prima facie case of personal jurisdiction. *Bell Paper Box, Inc. v. Trans W. Polymers, Inc.,* 53 F.3d 920, 921 (8th Cir. 1995); *Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas, S.A.,* 51 F.3d 1383, 1387 (8th Cir.1995). "Because jurisdiction is a threshold issue for the court, the district court has 'broader power to decide its own right to hear the case than it has when the merits of the case are reached.'" *Bellecourt v. United States,* 994 F.2d 427, 430 (8th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1049, 127 L.Ed.2d 371 (1994) (quoting *Osborn v. United States,* 918 F.2d 724, 729 (8th Cir.1990)). If, as in this case, the court relied on disputed factual issues, then those factual findings will be reviewed under the clearly erroneous standard. *Osborn,* 918 F.2d at 730 (citations omitted).

## III.

Admitting that it was a close case, the district court denied National's motion to dismiss for lack of personal jurisdiction. The plaintiff, herein Wessels, bore the ultimate burden of proof on this issue. *Dakota Indus., Inc. v. Dakota Sportswear,* 946 F.2d 1384, 1387 (8th Cir.1991). "To defeat a motion to dismiss for lack of personal jurisdiction, the nonmoving party need only make a prima facie showing of jurisdiction." *Id.* (citations omitted).

The determination whether a court has personal jurisdiction must satisfy both state and constitutional requirements. *Wines v. Lake Havasu Boat Mfg.,* 846 F.2d 40, 42 (8th Cir.1988) (per curiam). First, the applicable state long-arm statute, here Minnesota § 543.19,[3] must be met. Second, personal jurisdiction must comply with the requirements of due process. Because Minnesota long-arm statutes extend jurisdiction to the maximum limit consistent with due process, we need only evaluate whether the district court properly found the requirements of due process satisfied. *See Domtar v. Niagara Fire Ins. Co.,* 533 N.W.2d 25, 29 (Minn.1995); *Valspar Corp. v. Lukken Color Corp.,* 495 N.W.2d 408, 410 (Minn.1992); *Jenson v. R.L.K. & Co.,* 534 N.W.2d 719, 721–22 (Minn. Ct.App.1995). *See also Northrup,* 51 F.3d at 1387; *Land–O–Nod v. Bassett Furniture Indus.,* 708 F.2d 1338, 1340 (8th Cir.1983).

Due process allows a court to exercise personal jurisdiction over a non-resident defendant when the defendant has "certain minimum contacts with [the state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co.*

---

3. Minnesota § 543.19 authorizes the assertion of personal jurisdiction over a foreign corporation that "transacts business" within the state where the cause of action arises from that transaction.

Minn.Stat. § 543.19, Subds. 1(b) & 3. *See also Morris v. Barkbuster,* 923 F.2d 1277 (8th Cir. 1991).

*v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 342–43, 85 L.Ed. 278 (1940)). The defendant's conduct and connection with the state must be such that the defendant should "reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980). The defendant's acts must be substantial enough to give clear notice that it would be subject to suit in the forum state. *Id.* However, the unilateral activities of one claiming some relationship with the non-resident defendant is not enough to satisfy the minimum contacts requirement. *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283 (1958). It is essential in each case that there is some act by which the "defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id.* Where a forum state seeks specific personal jurisdiction over a non-resident defendant, due process is satisfied if "the defendant has 'purposely directed' his activities at residents of the forum ... and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 2182, 85 L.Ed.2d 528 (1985) (citations omitted).

 In conjunction with those basic principles of due process, this court applies a five-factor test in analyzing the constitutional requirements needed for personal jurisdiction: (1) the nature and quality of defendant's contacts with the forum state; (2) quantity of contacts; (3) source and connection of the cause of action with those contacts; [4] and to a lesser degree, (4) the interest of the forum state; and (5) the convenience of the parties. *Northrup,* 51 F.3d at

1388; *Land–O–Nod,* 708 F.2d at 1340; *Aftanase v. Economy Baler Co.,* 343 F.2d 187, 197 (8th Cir.1965); *see also Aaron Ferer & Sons Co. v. American Compressed Steel Co.,* 564 F.2d 1206, 1210 n. 5 (8th Cir.1977). The district court analyzed National's contacts in light of these factors and concluded National had sufficient minimum contacts with Minnesota. In our review, we also find that Minnesota properly has personal jurisdiction over National.

 First, National argues that Pappajohn's unilateral efforts as a director cannot be considered when analyzing the contacts between National and Minnesota because he was not the aggressor in the business relationship and had no authority to act on behalf of National. The district court found that it was "clear and uncontroverted" that Pappajohn was the aggressor in the relationship and initially solicited Kessler's services. Both parties in sworn affidavits, however, attest that it was the other one who initiated the first contact concerning the contract at issue. It is undisputed that Pappajohn knew Kessler when Kessler was previously employed at Smith Barney in New York. Pappajohn asserted that Kessler solicited his business with National at this time if a future opportunity ever arose where his services were required. Kessler stated that in the spring of 1992, Pappajohn called to discuss a potential merger National was considering and that the company needed a fairness opinion to present to its shareholders to justify the merger. Pappajohn does not dispute that the conversation took place, but contends that it was only made in response to Kessler's previous solicitation. Without having to stipulate who initiated the contact, the record is clear that after this contact National aggressively pursued a business relationship with Wessels. Viewing the facts in the

---

4. Whether the jurisdiction is specific or general will distinguish the relationship between the cause of action and the contacts. *Bell Paper Box, Inc. v. U.S. Kids, Inc.,* 22 F.3d 816, 819 (8th Cir.1994). Specific jurisdiction is jurisdiction over causes of actions arising from or related to the defendant's actions in the forum state. *Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 1872 n. 8, 80 L.Ed.2d 404 (1984). General jurisdiction refers

to the power of a state to adjudicate any cause of action regardless of where the cause of action arose. *Id.* The contacts involved in the present action are related to the dispute that resulted in this suit, and therefore the inquiry is one of specific, and not general, jurisdiction. *See also Sondergard v. Miles, Inc.,* 985 F.2d 1389, 1392 (8th Cir.), *cert. denied,* —— U.S. ——, 114 SCt. 63, 126 L.Ed.2d 32 (1993).

light most favorable to National, National could have declined Kessler's solicitation, but instead actively pursued a business relationship. Further, after Pappajohn and Kessler had assessed the situation, National's president, Embry, began negotiations with Kessler concerning a contract. Although unclear who made the phone call, what is clear is that National pursued a business relationship with Wessels and the district court's finding to this effect is not clearly erroneous.

█ Collateral to this argument, National contends that Pappajohn was not an agent of the corporation and his actions were unauthorized. The district court found that it was irrelevant whether Pappajohn was an agent of National or not because National clearly ratified his actions. National contends that there is no law to support the finding that the unauthorized actions of a director can bind a corporation to a forum state for personal jurisdiction purposes. Both Pappajohn and Embry testified that Pappajohn had no authority to act on behalf of National. The issue of whether Pappajohn had authority to act or not, however, becomes irrelevant when the record is clear that National supported, accepted, and followed through on the efforts initiated. Under Minnesota law, it is well established "that a principal cannot accept the benefits of the agent's unauthorized conduct and then deny liability based on the fact that the conduct was unauthorized." *Centennial Ins. Co. v. Zylberberg,* 422 N.W.2d 18, 21 (Minn.Ct.App.1988) (citing *Swanson v. Domning,* 86 N.W.2d 716, 721 (Minn.1957)). Although contacts for personal jurisdiction are different from a principal's liability for an agent's unauthorized conduct, the same analysis is applicable. Here the record clearly revealed that once the contact was initiated, Embry went forward with negotiations and eventually consummated an agreement for Kessler's services. National accepted and ratified Pappajohn's efforts whether Pappajohn officially had the authority to act or not. National cannot now deny Pappajohn's authority to act on behalf of the corporation when it has already accepted the benefits of Wessels' services. The district court's finding that National ratified Pappajohn's actions is not clearly erroneous and therefore Pappajohn's contacts with Minnesota are relevant.

National also argues that the mail and telephone contacts are insufficient to confer personal jurisdiction on National. As the district court correctly asserted, these contacts alone are insufficient to confer personal jurisdiction, but remain a consideration in determining whether the defendant purposely availed himself of the privilege of doing business in Minnesota. *See Wines,* 846 F.2d at 43; *Institutional Food Mktg. Assoc. v. Golden State Strawberries, Inc.,* 747 F.2d 448, 456 (8th Cir.1984); *Mountaire Feeds, Inc v. Agro Impex, S.A.,* 677 F.2d 651, 656 (8th Cir.1982). It is evidence of a continuous, systematic business relationship. Here all correspondence was directed to Wessels in Minnesota where the majority of the work under the contract was to be performed. Kessler testified that 90 percent of the work was performed in Minnesota. Aside from two outside visits to New York and Tennessee, the record supports that the majority of work required under the contract was performed in Minnesota. As the United States Supreme Court noted in *Burger King:*

> Jurisdiction ... may not be avoided merely because the defendant did not *physically* enter the forum State. Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are "purposefully directed" toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there. *Keeton v. Hustler Magazine, Inc.,* [465 U.S. 770, 774–75, 104 S.Ct. 1473, 1478–79, 79 L.Ed.2d 790].

*Burger King,* 471 U.S. at 476, 105 S.Ct. at 2184. Although the absence of physical presence within the state cannot defeat jurisdiction, in addition there were two occasions when Pappajohn visited Minnesota in relation to the contract. In October 1992 and in

May 1993, Pappajohn visited Minnesota and met with Kessler. In the May 1993 visit, Pappajohn brought a business associate of a company that eventually merged with National. National argues that these visits were not solely related to National's business with Wessels. The district court found that while other business may have been transacted, these contacts enriched the relationship and contract between the parties. The numerous mail and telephone contacts coupled with the physical visits by Pappajohn, which were all related to the contract, are evidence of National's contacts with Minnesota and indicates National's purposeful availment of the benefits and protections of Minnesota. *See e.g., Bell Paper Box,* 22 F.3d at 820 (finding personal specific jurisdiction when correspondence was directed at the forum state, performance of the contract was entirely within the forum state and there was only one physical visit to the forum state); *Papachristou v. Turbines, Inc.,* 902 F.2d 685, 686–87 (8th Cir.1990) (en banc) (finding personal specific jurisdiction existed when defendant made one visit to forum state and contract was performed entirely in forum state).

National further argues that the Minnesota choice-of-law provision is not significant in determining personal jurisdiction. National cites *Dent–Air, Inc. v. Beech Mountain Air Serv.,* 332 N.W.2d 904 (Minn.1983), for the proposition that these clauses are not pertinent when determining the nature and quality of contacts. In *Dent–Air,* the Minnesota Supreme Court stated:

> [R]espondents contend that the contract clause calling for application of Minnesota law is an important qualitative factor. We disagree. Had the parties wanted to ensure the use of Minnesota's courts in the event of breach of contract, they could have contractually consented to personal jurisdiction in Minnesota. A choice-of-law clause is not sufficient to confer jurisdiction, particularly where, as here, the clause was part of the lessor's standard lease form.

*Id.* at 908. We find, however, that a choice-of-law clause is an important factor in determining whether the defendant purposely availed itself in the forum state. The Su-

preme Court stated in *Burger King* that "[n]othing in our cases ... suggests that a choice-of-law *provision* should be ignored in considering whether a defendant has 'purposefully invoked the benefits and protections of a State's laws' for jurisdictional purposes." *Burger King,* 471 U.S. at 482, 105 S.Ct. at 2187. The choice-of-law clause, like the mail and telephone contacts, is insufficient standing alone to confer jurisdiction. However, when these contacts are combined with the other factors, they become wholly relevant and significant. It is also important that the choice-of-law clause at issue here was specifically negotiated by the parties. In *Dent–Air,* the clause was part of a standard lease agreement.

Pappajohn procured the expertise of an investment banking firm for assistance with financial problems that were facing his corporation. The record evidences that National accepted the director's efforts and actively pursued a business relationship with Wessels whereby a contract was subsequently consummated. The contract was performed by Wessels virtually in its entirety in Minnesota. There were substantial mail and phone correspondence between National and Wessels and two visits by Pappajohn to Minnesota to discuss obligations under the contract. Taken as a whole, the nature, quantity, and quality of the contacts and the relationship of the contacts to the cause of action sufficiently meet the due process requirements of personal jurisdiction.

### IV.

■ Next, the appellant asks us to review the district court's grant of summary judgment in favor of Wessels on the breach of contract claim. National disputes that the July 29, 1992 letter was a fully integrated agreement because it did not contain a merger clause and therefore parol evidence of the parties' intentions is admissible. In the alternative, National contends that even if the agreement were final and complete, the completion of the merger was a condition precedent to National's obligation to pay. The district court found that the letter agreement was a complete integration of the parties' contractual agreement and that the absence

of a merger clause was not indicative that the agreement was incomplete. Further, the court refused to imply that the completion of the merger was a condition precedent because it was contrary to the plain language of the contract.

■■■■■ We accept the district court's determination on both accounts. First, the district court determined that the July 29, 1992 letter was a final integration of the parties' intentions. As part of this finding, the court held that the contract was clear and unambiguous on its face. As such, the district court was not obliged to look beyond the face of the written contract. Ambiguity in a contract exists if it is susceptible to more than one construction. *Trondson v. Janikula*, 458 N.W.2d 679, 681 (Minn.1990); *Hunt v. IBM Mid Am. Employees Fed. Credit Union*, 384 N.W.2d 853, 856 (Minn.1986); *Republic Nat'l Life v. Lorraine Realty Corp.*, 279 N.W.2d 349, 354 (Minn.1979). The trial court decides whether the contract is completely integrated and therefore subject to the parol evidence rule. *McNeill & Assoc., Inc. v. ITT Life Ins. Corp.*, 446 N.W.2d 181, 186 (Minn.Ct.App. 1989) (citing *Taylor v. More*, 263 N.W. 537, 540 (Minn.1935)). If the written contract imports on its face to be a complete expression of the whole agreement, it is presumed the parties included all the essential terms. *Id.* The well-established rule is:

> [W]here parties have reduced their contract to writing, the contract may not be proved by prior or contemporaneous utterances or writings and that these are entirely immaterial for the purpose of determining what the terms of the contract are.... The law is not one of evidence, but of substantive law—the writing is the contract, not merely the evidence thereof.

*Lehman v. Stout*, 112 N.W.2d 640, 644 (Minn. 1961) (quoting *Karger v. Wangerin*, 40 N.W.2d 846, 849 (Minn.1950)).

National argued that the July 29, 1992 letter agreement was not fully integrated because there was no merger clause formalizing that the letter was the final expression of the parties' intentions. A formal incantation, however, does not make the agreement unexceptionably final. Such a clause is only indicative of parties' intentions. Even when a merger clause has been included, courts have still admitted parol evidence. *See e.g., Johnson Bldg. Co. v. River Bluff Dev.*, 374 N.W.2d 187, 193 (Minn.Ct.App.1985). The prior conduct of the parties further evidences that the parties intended the letter to be the final integration of their intent. After Wessels performed its obligations, the parties wrote letters to each other concerning National's obligation to pay. During this exchange, National never asserted that the agreement was not final or that the payment was conditioned on the completion of the merger. Additionally, the fact the contract provided only for written modifications or amendments, and there were none, evidences that the agreement was final. As the district court noted, both parties were sophisticated business entities who negotiated and submitted several drafts before the July 29, 1992 letter was executed. Conditional payment would be considered a material term to the contract that reasonably would have been provided for in the arrangement. The evidence supports that the July 29, 1992 letter was a complete integration of the parties' intentions.

■■■■■ National argued in the alternative that if the letter was a final integration of the obligations then the completion of the merger was a condition precedent to National's obligation to pay. National offers Embry's testimony to this effect. National also asserts that paragraph five of the agreement supports this argument because it provided for the reimbursement of expenses whether the merger went through or not; therefore, it argues, that the payment for services was contingent on the merger's effectuation. It is a general rule that parol evidence is admissible to show parties made an agreement prior to or contemporaneously with the execution of a written instrument whereby the written agreement should become binding only upon the happening of a condition. *Craigmile v. Sorenson*, 58 N.W.2d 865, 871–72 (Minn.1953). The theory behind this rule is that this type of extrinsic evidence merely goes to show that the writing never became operative. *Id.* "An intention to make a duty conditional may be manifested by the general nature of the agreement, as well as by specif-

ic language." *Seman v. First State Bank of Eden Prairie,* 394 N.W.2d 557, 560 (Minn.Ct. App.1986) (citations omitted). However, where the language of the contract is clear and unambiguous, there is no opportunity for interpretation or construction. *Carl Bolander & Sons, Inc. v. United Stockyards Corp.,* 215 N.W.2d 473, 476 (Minn.1974). Therefore, a court should determine the meaning of the contract in accordance with its plainly expressed intent and not what was intended to be written. *Id.* Here the district court refused to imply the condition because the plain language of the contract did not support such an interpretation. We agree. The paragraph in question specifically provides:

> A financial advisory fee of $200,000 payable within 20 business days from the delivery of the opinion (whether verbal or written) to the Board of Directors of National. If a verbal opinion is delivered, then Wessels will furnish a written opinion as soon as possible thereafter. The retainer fee will be credited against the financial advisory fee.

The contract does not provide for payment once the merger is completed; rather, the agreement succinctly states that payment is due within 20 days from the date the opinion is delivered, whether verbal or written. National contends that paragraph five of the agreement indicates that National's payment obligations were limited if the merger was not completed. Paragraph five states that whether or not the merger was consummated Wessels' expenses shall be paid. National argued that since the letter did not expressly provide payment for services regardless of the merger's completion, payment was therefore conditional. The plain language and a plain reading of the payment clause as reiterated above does not support this argument. Constructions and interpretations of contracts that lead to absurd results should be avoided. *American Warehousing & Distributing, Inc. v. Michael Ede Management, Inc.,* 414 N.W.2d 554, 557 (Minn.Ct.App.1987). The July 29, 1992 letter agreement was a final and fully integrated agreement that did not condition payment on

the consummation of a merger. Accordingly, the district court is AFFIRMED.