Rogers W. CLARK, et al.

v.

AMERICA'S FAVORITE CHICKEN CO., et al.

Civ. A. No. 93–3029.

United States District Court, E.D. Louisiana.

Dec. 18, 1995.

Stephen G. Bullock, Stephen H. Kupperman, Phillip A. Wittmann, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, LA, William David Aaron, Jr., Nancy Eleanor Graham, Brent Bennett Barriere, Bruce Victor Schewe, Phelps Dunbar, New Orleans, LA, Robert V. Seymour, Sallen, Sallen, et al., Southfield, MI, for Rogers W. Clark, Jr., Roger R. Burney, Franchise Management Unlimited, Seven Mile Catering.

Steven W. Copley, Ernest Enrique Svenson, Martin E. Landrieu, Gordon, Arata, McCollam & Duplantis, New Orleans, LA, Peter J. Klarfeld, Brownstein, Zeidman & Lore, Washington, DC, Kenneth J. McIntyre, John A. Krsul, Jr., Dickinson, Wright, Moon, Vandusen & Freeman, Detroit, MI, David B. Kaplin, Brownstone, Zeidman & Lore, Washington, DC, James C. Rubinger, Wiley, Rein & Fielding, Washington, DC, for America's Favorite Chicken Co.

James B. Irwin, V, Robert Ellsworth Durgin, Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, LA, David F. Graham, Sidley & Austin, Chicago, IL, Eugene Driker, Barris, Scott, Denn & Driker, Detroit, MI, David B. Johnson, Sidley & Austin, Chicago, IL, for Canadian Imperial Bank of Commerce.

Richard Anthony Goins, Mark Raymond Beebe, Adams & Reese, New Orleans, LA, for Frank Belatti, Belatti Consulting Group, Ltd.

## ORDER AND REASONS

JONES, District Judge.

Before the Court is the "Motion of Frank J. Belatti and Belatti Consulting Group, Ltd., to Dismiss the Complaint." Having considered the memoranda of the parties, the record and the applicable law, the Court GRANTS the motion.

### Background

Plaintiffs are "Popeyes Fried Chicken" (hereinafter "Popeyes") fast-food restaurant franchisees in Detroit who originally filed this lawsuit against America's Favorite Chicken Company (hereinafter "AFC") and Canadian Imperial Bank of Commerce (hereinafter "CIBC"), alleging breach of contract (express and implied), promissory estoppel, unfair trade practices, tortious interference with contract and business relationship, abuse of rights and conspiracy against CIBC.[1]

---

1. *See* "Fifth Supplemental and Amended Complaint." (R.Doc. 188.)

The action arises out of allegations that, since the merger of Popeyes and Church's Fried Chicken (hereinafter "Church's") in March 1989,[2] plaintiffs have been subjected to various actions by defendants that have caused them damages. These actions revolve around alleged marketing policies that favor Popeyes as upscale stores and Church's as low-scale fried chicken outlets.

Plaintiffs contend that the predecessor of AFC, Al Copeland Enterprises (hereinafter "ACE"), and AFC made certain promises to them that their inner-city Popeyes' franchises in Detroit would remain price-competitive with other fast food outlets, particularly Church's.[3] Plaintiffs allegedly pioneered a system of advertising competitive with Church's.[4] Further, ACE encouraged Plaintiffs to select sites immediately adjacent to existing Church's restaurants.[5]

Later, after ACE bought Church's, and after AFC took over ACE following ACE's bankruptcy, ACE and CIBC or AFC and CIBC conspired to operate a dual-marketing strategy to restrain, eliminate and lessen competition between Popeyes and its franchisees and Church's.[6]

In their last amended complaint, plaintiffs also named as defendants Frank Belatti and Belatti Consulting Group, Ltd (hereinafter "BCG").[7] Factually, plaintiffs maintain that,

> [p]ursuant to a consulting agreement between CIBC and [BCG], effective March or April 1992, Belatti and/or [BCG] and/or [BCG's] staff acted as the authorized agent of CIBC and were empowered with express and/or implied and/or apparent authority to make promises to Plaintiffs to purchase certain of their Popeyes franchises or otherwise to take positive steps to improve the financial condition of these franchises as a *quid pro quo* for Plaintiffs' assistance and support of the CIBC reor-

ganization plan for ACE and conditioned upon said confirmation.[8]

A few months later in July 1992, according to the complaint as amended, Belatti and/or BCG "and/or other authorized representatives and/or agents of CIBC who were working with" BCG requested a meeting with plaintiffs and solicited plaintiffs' support in obtaining other franchisees' support for CIBC's reorganization plan while ACE was in bankruptcy.[9] Plaintiffs agreed, polling and soliciting other franchisees and testifying *via* affidavit in support of CIBC's reorganization plan.[10] Plaintiffs claim that they, Belatti and/or BCG's staff understood that plaintiffs' support of and assistance for the CIBC plan would be in return for Belatti's and/or BCG's "promises and/or representations to terminate ACE's practice and conduct . . . of the 'dual marketing strategy' and/or to purchase certain of Plaintiffs' Popeyes' franchises or otherwise to take positive steps to improve the financial condition" of plaintiffs' restaurants if CIBC's plan were confirmed.[11]

In addition to claiming that CIBC is liable to plaintiffs for the "conduct and performance failures of their agents Belatti" and BCG,[12] plaintiffs also contend that Belatti and/or BCG are personally liable to plaintiffs. Count III of plaintiffs' complaint, as amended, alleges breach of oral contract and reads:

> The conduct of Belatti and/or [BCG], as described herein, was within their express or implied authority pursuant to a consulting agreement between CIBC and [BCG]. Alternatively, Belatti and/or [BCG] were manifested and/or clothed by CIBC with the apparent authority to make the promises and/or representations described herein to plaintiffs as a *quid pro quo* for their support of the CIBC reorganization plan. Plaintiffs reasonably relied on the prom-

2. *Id.,* ¶ 18.

3. *Id.,* ¶ 14.

4. *Id.,* ¶ 15.

5. *Id.,* ¶ 11.

6. *Id.,* ¶¶ 22–24.

7. *Id.,* 4–5.

8. *Id.,* ¶ 30.

9. *Id.,* ¶ 31.

10. *Id.,* ¶ 32.

11. *Id.*

12. *Id.,* Count II, ¶ 62.

ises and representations of Belatti and/or [BCG]. Belatti and/or [BCG] refused to perform their obligation to Plaintiffs, which failure has caused Plaintiffs to continue to suffer monetary losses and damages to their business and property. Belatti and/or [BCG] are liable to Plaintiffs for their conduct and performance failures in their capacities as the agent or agents of CIBC.[13]

Count IV of the amended complaint alleges that the conduct of AFC, CIBC, Belatti and/or BCG "constitutes a breach of their respective promises to Plaintiffs," upon which plaintiffs reasonably relied.[14] "As a direct and proximate result of the breaches of these promises, Plaintiffs have suffered and sustained, and will continue to suffer and sustain, substantial monetary losses and damages . . . ." [15]

In the present motion Belatti and BCG seek dismissal from this lawsuit for alternative reasons. First, Belatti and BCG posit that this Court should not exercise personal jurisdiction over them. Second, they claim that plaintiffs' amended complaint fails to state a cause of action against them individually.

Plaintiffs counter that there is ample evidence obtained through discovery to show that this Court should and can properly exercise *in personam* jurisdiction over Belatti and BCG. Further, plaintiffs maintain that their amended complaint clearly states a cause of action against defendants.

## Law and Application

### I. Personal Jurisdiction

The Court initially addresses the defendants' motion to dismiss for lack of personal jurisdiction. The analysis used to determine if a court may exercise jurisdiction over a non-resident defendant consists of two steps. The first question is whether the defendant is "amenable to service of process under the forum state's jurisdictional long-arm statute." *Dalton v. R & W Marine, Inc.,* 897 F.2d 1359, 1361 (5th Cir.1990). The second issue is whether "the exercise of jurisdiction under

this statute . . . comport[s] with norms imposed by the due process clause of the fourteenth amendment." *Id.* In Louisiana the limits of constitutional due process and the Louisiana Long-arm statute are coextensive. LSA–R.S. § 13:3201(B); *Dalton,* 897 F.2d at 1361. "The statutory and constitutional inquiries thus merge." *Id.*

> In order for an exercise of personal jurisdiction to be consistent with due process, the nonresident defendant must have some minimum contact with the forum which result from an affirmative act on the part of the nonresident. In evaluating a nonresident's contacts with the forum, we must determine whether the nonresident has purposefully availed himself [or itself, as in this case] of the privilege of conducting activities within the forum state, thus invoking the benefits and protection of its laws. The defendant's conduct and connection with the forum state must be such that he [or it] should reasonably anticipate being haled into court in the forum state.

*Holt Oil & Gas Corp. v. Harvey,* 801 F.2d 773, 777 (5th Cir.1986) (citations omitted).

The court initially must determine if "minimum contacts" exist between defendant and the forum "such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id.,* quoting *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). Even if "minimum contacts" exist, the court must then determine if requiring a defendant to litigate in the forum state would be unfair. *Dalton,* 897 F.2d at 1361.

In determining whether "minimum contacts" exist, "[a]s an analytic device, the Supreme Court draws a distinction between specific and general jurisdiction." *Coats v. Penrod Drilling Corp.,* 5 F.3d 877, 884 (5th Cir.1993). "For specific jurisdiction, the defendant must have purposely directed his activities at the resident of the forum and, the litigation must result from the alleged injuries that arise out of or relate to the defendant's activities directed at the forum."

---

**13.** *Id.,* Count III, ¶ 63.

**14.** *Id.,* Count IV, ¶ 64.

**15.** *Id.*

*Id.* In other words, "defendants' contacts with the forum which are asserted as the basis for jurisdiction must be related to the subject matter of the controversy," *Aviles v. Kunkle,* 978 F.2d 201, 204 (5th Cir.1992), or must be the result of "affirmative acts performed in connection with the subject matter of this litigation." *Patterson v. Dietze, Inc.,* 764 F.2d 1145, 1146 (5th Cir.1985). When a court is determining whether specific personal jurisdiction exists, it must focus on "the relationship between the defendant, the forum and the litigation." *Coats,* 5 F.3d at 884. In certain cases, "a single, substantial act directed toward the forum can support specific jurisdiction." *Dalton,* 897 F.2d at 1361. *See also Ham v. La Cienega Music Co.,* 4 F.3d 413, 415 (5th Cir.1993).

Even if a cause of action does not arise out of the foreign defendant's purposeful contacts with the forum, a nonresident defendant may be subject to the forum state's jurisdiction in accord with due process if "the defendant ha[s] engaged in 'continuous and systematic contacts' in the forum to support the exercise of 'general' jurisdiction over the defendant." *Dalton,* 897 F.2d at 1361–62.

■ As noted, if a court decides that plaintiffs have established either specific or general jurisdiction, the next step is to determine whether requiring nonresident defendants to litigate in the forum state would be constitutionally unfair. *Dalton,* 897 F.2d at 1361. The factors to be taken into account in this inquiry include the burden on the defendant, the interests of the forum state, the plaintiff's interest in obtaining relief, the interest in obtaining an efficient resolution of the issues in this controversy and the interests of the several states in furthering their policies. *Id.* at 1363.

■ The burden is on plaintiffs to establish the Court's jurisdiction over Belatti and BCG, *see Stuart v. Spademan,* 772 F.2d 1185, 1192 (5th Cir.1985), but plaintiffs need only prove a *prima facie* case of personal jurisdic-

tion prior to trial. *Dalton,* 897 F.2d at 1362. *See also Bullion v. Gillespie,* 895 F.2d 213, 217 (5th Cir.1990). Further, uncontroverted allegations in the complaint are taken as true, and conflicts between affidavits and/or other discovery responses, if any, filed by the parties "must be resolved in the plaintiff's favor for purposes of determining whether a *prima facie* case for personal jurisdiction exists." *Id.* In determining the jurisdictional issue, the court is not limited to reviewing affidavits submitted by the parties but may also consider "interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery." *Spademan,* 772 F.2d at 1192.

Having stated these principles, the Court turns to the issue at hand, *i.e.,* whether due process would be violated if jurisdiction were asserted over either Belatti or BCG.

### A. Facts

Belatti's declaration attached to his memorandum in support establishes the following:

He is presently chairman of the Board and Chief Executive Officer of AFC and is a citizen and resident of Georgia, both now and "at all times relevant to the claims set forth in the Complaint...." [16] At no time has he ever lived or maintained an office, bank account or telephone number in Louisiana; nor has he conducted any business of any kind here "in his personal capacity." [17] In early 1992, Belatti caused to be formed BCG, which is and always has been a Georgia corporation.[18] BCG also has never maintained an office, employees, agents, a bank account or telephone number in Louisiana; nor has it "conducted business of any kind[ ] in the state of Louisiana." [19]

Belatti asserts that BCG acted as a consultant pursuant to a contract with CIBC from March 1992 through November 1992 in connection with the bankruptcy of ACE.[20] At that time ACE's bankruptcy was pending in bankruptcy court in Texas, and ACE was

---

**16.** "Declaration of Frank J. Belatti," ¶¶ 1–2, unnumbered exhibit attached to defendants' motion to dismiss. (R.Doc. 201.)

**17.** *Id.,* ¶ 2.

**18.** *Id.,* ¶ 3.

**19.** *Id.*

**20.** *Id.,* ¶ 4.

franchisor of Popeyes and Church's franchise systems incorporated in Texas.[21]

According to his declaration, Belatti performed numerous tasks to assist CIBC, ACE's principal creditors, in its efforts to "win confirmation of its plan of reorganization of ACE and to develop a business plan for the reorganized entity."[22] Belatti states that, "with the exception of one short meeting with Al Copeland at his home, . . . at no time during ACE's bankruptcy did [he] travel to Louisiana or have direct access to the corporate headquarters of ACE in Louisiana."[23]

Belatti further declares that, after confirmation of CIBC's reorganization plan by the bankruptcy court, he travelled to ACE's headquarters in Louisiana as chairman and CEO of AFC, "which was a new corporation into which ACE merged" on the effective date of the reorganization.[24] From November 1992 until May 1993, AFC maintained its headquarters in Louisiana but then moved its base of operations to Atlanta.[25] Belatti further intones:

> During the period November 1992 through May 1993, however, I did not maintain an office in Louisiana. Rather, I performed my duties as Chairman and CEO of AFC from AFC's office in Atlanta, Georgia.[26]

As to any meetings with plaintiffs Roger Burney, Rogers Clark, or both, Belatti intones that the first meeting was in late July 1992 at the offices of BCG in Atlanta.[27] The second meeting was in Austin, Texas, in connection with ACE's bankruptcy in early August 1992, and the third was in September 1992 at BCG's office in Atlanta.[28] He further states: "I do not believe that I have ever met with either Mr. Burney or Mr. Clark in Louisiana, or had any dealings with them that were in any way connected with Louisiana."[29]

Plaintiffs do not controvert any of Belatti's assertions but contend there is more to the story. Plaintiffs point to defendants' answers to interrogatories, which, plaintiffs maintain, show that direct contact was made between BCG personnel and ACE employees or representatives during 1992 and information received by Belatti and BCG as to Popeyes, Church's or ACE.[30] Specifically, plaintiffs point to defendants' supplemental answers to interrogatories which indicate that BCG consultants traveled to Louisiana to meet with a spice supplier and to survey ACE real estate.[31] Further, in addition to Belatti's travels to New Orleans, another BCG employee "who was responsible during the transition phase for the assessment of Popeyes and Church's [sic] operations and was tapped to run ACE operations postconfirmation" travelled to Louisiana during the ACE bankruptcy.[32]

Plaintiffs also cite deposition testimony of Belatti that indicates that Belatti understood that CIBC was searching for a management

21. *Id.*

22. *Id.,* ¶¶ 4–5.

23. *Id.,* ¶ 5. *See also* Defendants' "Supplemental Answers to Interrogatory No. 8," explaining that "[t]he purpose of the meeting was to communicate [Belatti and another BCG employee's] willingness to work out a plan of reorganization which would be in the best interest of all parties and to express a desire for a smooth transition." Plaintiffs' motion to file supplemental interrogatory answer. (R.Doc. 262.)

24. "Declaration of Frank J. Belatti," ¶ 6, unnumbered exhibit attached to defendants' motion to dismiss. (R.Doc. 201.)

25. *Id.*

26. *Id.*

27. *Id.,* ¶ 8.

28. *Id.*

29. *Id.*

30. Plaintiffs' supplemental memorandum in opposition, p. 3, referring to supplemental answers to interrogatories Nos. 9 and 11 attached to the supplemental memorandum as Exh. 5. (R.Doc. 244.)

31. *Id.,* referring to supplemental answers to interrogatories Nos. 7 and 8, attached to plaintiffs' supplemental memorandum.

32. *Id.* Plaintiffs' also contend that Belatti's deposition testimony is evidence of these contacts, but the Court finds that Belatti's testimony on this point is equivocal. Deposition of Frank J. Belatti, pp. 77–78, attached to defendants' memorandum in opposition. (R.Doc. 232.)

company to manage Popeyes' and Church's if CIBC's reorganization plan was confirmed.[33]

Finally, plaintiffs highlight Belatti's reservation of the name "America's Favorite Chicken Company" in the State of Louisiana in connection with BCG's duties under its contract with CIBC, although the Court also notes that this name was also reserved in several other states in addition to Louisiana.[34]

Viewing the foregoing facts in favor of plaintiffs' on this motion, as the Court must, the Court now turns to plaintiffs' specific arguments why Belatti and BCG are subject to personal jurisdiction in Louisiana.

### B. Specific Jurisdiction .

Plaintiffs contend that defendants are subject to specific jurisdiction in this forum because Belatti and BCG quite obviously wanted to become the management company if CIBC's reorganization plan was confirmed and, in the course of achieving that goal, not only made the alleged promises to plaintiffs that form the basis of this lawsuit and sought plaintiffs' support for the plan but also performed activities in Louisiana toward that goal. In essence, plaintiffs argue that their cause of action against Belatti and BCG are inextricably tied to their efforts and contacts in Louisiana on the road to their takeover of ACE.

■ The Court finds that plaintiffs' argument is ill-founded because, although at first glance Belatti and BCG's activities in Louisiana seem to be related to plaintiffs' cause of action, a closer look reveals the attenuated nature of this relationship. As noted above, in order to satisfy due process concerns on the basis of specific jurisdiction, "defendants' contacts with the forum which are asserted as the basis for jurisdiction must be related to the subject matter of the controversy." *Aviles*, 978 F.2d at 204. As another Fifth Circuit opinion described it, in order to find that specific jurisdiction exists, "[t]he trial court [is] required to determine whether [de-

fendants] had the necessary minimum contacts with [Louisiana] *as a result of affirmative acts performed in connection with the subject matter of this litigation."* *Patterson*, 764 F.2d at 1146 (emphasis added).

■ Based on the foregoing facts, viewed favorably toward plaintiffs, the Court fails to find that either Belatti or BCG acted affirmatively in Louisiana in connection with the plaintiffs' cause of action. The facts certainly indicate that Belatti and/or BCG through its employees performed some tasks in Louisiana in relation to their attempt to get the CIBC plan of reorganization confirmed. However, there is a total absence of facts which show that Belatti and/or BCG performed affirmative acts in Louisiana related to plaintiffs' claims against them that they made promises to plaintiffs which they did not keep and/or that plaintiffs relied on these failed promises to their detriment.[35] Indeed, the undisputed facts show that, as to these claims for breach of contract and detrimental reliance claims, the alleged promises were made in either Georgia and/or Texas and the injury could only have occurred in Michigan, the site of the plaintiffs' franchises. This fact undercuts plaintiff's position under the law. *See Holt*, 801 F.2d at 778 (conclusion that specific jurisdiction could not be asserted in Texas "bolstered by fact that performance of contact was centered in Oklahoma rather than Texas").

Further, mere information-gathering and a few visits to Louisiana do not constitute sufficient contacts to support an exercise of specific jurisdiction. The Fifth Circuit has recognized that "an exchange of communications between a resident and nonresident in developing a contract is insufficient to be characterized as purposeful activity invoking the benefits and protection of the forum state's laws." *Spademan*, 772 F.2d at 1193, *citing Hydrokinetics, Inc. v. Alaska Mechanical, Inc.*, 700 F.2d 1026, 1029 (5th Cir.1983). If contacts in "developing a contract" in a state between a resident and nonresident are insufficient to assert personal jurisdiction, it is

---

**33.** *Id.*, pp. 41–42.

**34.** Exh. 4, plaintiffs' memorandum in opposition. (R.Doc. 232.)

**35.** *See* Counts III and IV, ¶¶ 63–64, plaintiffs' "Fifth Supplemental and Amended Complaint." (R.Doc. 188.)

clear that, under the present facts, contacts between Belatti and BCG with others unrelated to the specific claims of plaintiffs—who are not even located in the forum state—do not suffice to allow an exercise of personal jurisdiction.

Therefore, focusing on the defendants, the forum and the litigation, the Court finds that defendants failed to invoke the benefits and protections of Louisiana's laws as to plaintiffs' alleged claims. *Coats,* 5 F.3d at 884, *citing Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985) and *quoting Bullion v. Gillespie,* 895 F.2d 213, 216 (5th Cir.1990) (which, in turn, cites *Burger King* ). Moreover, mindful that "the foreseeability that is critical to the due process analysis ... is that the defendant's conduct and the connection with the forum state are such that he should reasonably anticipate being haled into court there," *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980), the Court declines to exercise specific jurisdiction over defendants. If anything, defendants' contacts with Louisiana—at least insofar as their claims against defendants are concerned—are fortuitous and attenuated, and the Court refuses to sustain specific jurisdiction on this basis. *See Burger King,* 471 U.S. at 475, 480, 105 S.Ct. at 2183, 2186.

For this same reason the Court disagrees with plaintiffs that any of defendants' acts constitute a single act substantial enough to support jurisdiction. As the *Burger King* Court stated, although a single act may support the assertion of jurisdiction, " 'some single or occasional acts' related to the forum may not be sufficient to establish jurisdiction if 'their nature and quality and the circumstances of their commission' create only an 'attenuated' affiliation with the forum."

*Burger King,* 471 U.S. at 475 n. 18, 105 S.Ct. at 2184, n. 18. Such an attenuated situation exists here.

■ Plaintiffs also maintain that the forum clause in ACE's franchise contracts with Popeyes' franchisees gives the Court reason to exercise specific personal jurisdiction over defendants. The clause provides that any action brought by either party against the other shall be brought in state or federal court in Louisiana and that the parties waive any questions of personal jurisdiction or venue for the purpose of the provision.[36] Plaintiffs argue that because Belatti was aware of this clause during the bankruptcy, this is further evidence that the exercise of specific jurisdiction over Belatti and BCG is appropriate. However, plaintiffs overlook the fact that the forum selection clause binds only the parties to the franchise agreement.[37] Further, any knowledge of Belatti about the existence of such a clause is far too attenuated from plaintiffs' claims against Belatti and BCG in order for this Court to assert specific jurisdiction over these defendants.

Finally, the Court notes that the only case cited by plaintiffs' as to their contention that Belatti and/or BCG's reservation of a corporate name is sufficient for this Court to exercise specific jurisdiction is *Ham.* Plaintiffs' specific reference to *Ham* is to the proposition that "[p]urposeful forum-directed activity—even if only a single substantial act—may permit the exercise of specific jurisdiction in an action arising from or related to such contacts." *Ham,* 4 F.3d at 415–16. However, because the Court finds, as explained above, that any such activity is too attenuated to relate directly to plaintiffs' claims, the Court rejects plaintiffs' theory.

Therefore, the Court holds that plaintiffs' have failed to establish a *prima facie* case of

**36.** *See* Plaintiffs' memorandum in opposition, p. 7 and n. 4. (R.Doc. 232.)

**37.** For this and other reasons, the case cited by plaintiffs in support of this point, *Wessels, Arnold & Henderson v. National Medical Waste, Inc.,* 65 F.3d 1427 (8th Cir.1995) is inapposite. First, the clause in *Wessels* was a choice-of-law clause, not a forum selection clause. *Id.* at 1434. Second, unlike the present situation, where there is no evidence that either Belatti or BCG was a signa-

tory to the franchise agreement cited by plaintiffs, the defendant in *Wessels* contesting personal jurisdiction executed the agreement. *Id.* at 1430. Third, the Eighth Circuit considered the choice-of-law clause, and specifically its negotiation, as one of a series of events constituting evidence that the defendant had purposefully taken advantage of Minnesota's benefits and protections. *Id.* at 1434.

**398**

specific jurisdiction has to defendants Belatti and BCG.

### C. General Jurisdiction

■ Although plaintiffs' contend that specific personal jurisdiction is "more likely applicable to the present matter,"[38] plaintiffs do not retreat entirely from contending that general personal jurisdiction also is appropriate in this matter. Therefore, the Court addresses this issue. As with specific jurisdiction, the Court finds that it would be improper to assert general jurisdiction over defendants in this matter based on the record before the Court.

It is undisputed that neither Belatti nor BCG have maintained any offices or bank accounts or specifically conducted business in Louisiana, other than to gather information by telephone or in person, to survey real estate, and to reserve a corporate name. Further, BCG is a Georgia corporation. The facts also show that even after he became Chairman and CEO of AFC, Belatti did not conduct business on behalf of AFC in Louisiana but did so from AFC's office in Atlanta. The Court finds that this case is similar to *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). There the chief executive officer of the petitioner/Columbian corporation, hereinafter referred to as "Helicol," as done by the Supreme Court, *id.* at 409, 104 S.Ct. at 1870, conferred in Houston with joint venturers as to a contract for the use of helicopters. *Id.* at 410, 104 S.Ct. at 1870. Helicol also purchased spare parts from a Texas company, sent prospective pilots there to train and ferry aircraft to South America, and sent management and maintenance personnel to Forth Worth for training and consultation. *Id.* at 411, 104 S.Ct. at 1870. It also accepted checks in its New York City and Florida bank accounts drawn on a Houston bank. *Id.* Other than these contacts, Helicol had no connection with Texas; it had never been authorized to do business there, had never had an agent there, had never conducted any type of business there and had never signed a contract there. *Id.,* at 410–12, 104 S.Ct. at 1870–71. The Supreme

Court explored Helicol's contacts with Texas "to determine whether they constitute the kind of continuous and systematic general business contacts" necessary for due process and held "that they [did] not." *Id.* at 415–16, 104 S.Ct. at 1872–73. The Court found that the trip to Houston by the Helicol CEO was not a "continuous and systematic" contact and could not support *in personam* jurisdiction. *Id.* at 416, 104 S.Ct. at 1873. The acceptance of checks from a Texas bank was of "negligible significance." *Id.* Nor did Helicol's purchases from Texas, thought substantial, or the training of its employees in Texas constitute significant contacts sufficient for the court to exercise general jurisdiction. *Id.* at 418, 104 S.Ct. at 1874.

In this case, the contacts between Belatti and BCG and the State of Louisiana are even less in number and slighter in nature than in *Helicopteros.* The contacts mainly are comprised of information-gathering, and even these are limited in number. Belatti himself made only one trip to Louisiana, and other BCG personnel's visits to Louisiana were limited in number and scope. These isolated journeys into Louisiana "for business purposes [do] not constitute the level of contact which must exist for general jurisdiction to lie." *G & H Partners, Ltd. v. Boer Goats International, Ltd.,* 896 F.Supp. 660, 666 (W.D.Tex.1995).

After the establishment of AFC, Belatti visited the headquarters but later did not even run this business from Louisiana, instead choosing to conduct its business from Atlanta. Further, it stands uncontroverted that Belatti conducted no "personal business" in Louisiana, in addition to the undisputed facts that he maintained no bank accounts or telephone number in Louisiana. Thus, although AFC may be subject to personal jurisdiction in Louisiana, there is no evidence to support a finding of continuous or systematic contacts by Belatti personally in Louisiana which would support a finding of general jurisdiction. Moreover, Belatti is protected from the assertion of jurisdiction arising out of any business Belatti conducted on behalf of AFC in Louisiana by "the fiduciary-shield

---

**38.** Plaintiff's memorandum in opposition, p. 3.

(R.Doc. 232.)

doctrine—which holds that an individual's transaction of business within the state solely as a corporate officer does not create personal jurisdiction over that individual even though the state has *in personam* jurisdiction over the corporation...." *Stuart v. Spademan*, 772 F.2d 1185 at 1197 (5th Cir. 1985).[39]

Plaintiffs also cite no law in support—and this Court has found none—that indicates that reservation of corporate name by someone in a State is an act that would allow the exercise of general jurisdiction over any person or entity. Indeed, in the Fifth Circuit, even the affirmative act of "being qualified to do business" through appointment of an agent for service of process in a State " 'is of no special weight' in determining general jurisdiction." *Wenche Siemer v. Learjet Acquisition Corp.*, 966 F.2d 179, 181 (5th Cir. 1992), *quoting Ratliff v. Cooper Laboratories, Inc.*, 444 F.2d 745, 748 (4th Cir.1971). Hence, the Court is hard-pressed to find that Belatti and/or BCG's mere act of reservation of a corporate name in Louisiana subjects either to general jurisdiction.

Plaintiffs have made no showing that either defendant has "conducted business" in a general sense here—Belatti personally or BCG in its corporate capacity. Simply put, the contacts with Louisiana by Belatti and BCG are so few and far between that the exercise of general jurisdiction over them would severely violate due process.

Finally, the Court contrasts this case with *Holt, supra,* one of the leading Fifth Circuit cases on general jurisdiction, where the court of appeals sustained the assertion of general jurisdiction over defendant on the basis of defendant's numerous contacts with Texas. *Holt,* 801 F.2d at 779. These included attendance of college and former employment in Texas; ownership of real estate there; frequent travels to visit children and for recreation; and transaction of "a great deal of

business in Texas." *Id.* There is no evidence of such contacts between Louisiana and Belatti and/or BCG.[40]

Hence, the Court also holds that plaintiffs have failed to establish a *prima facie* case for this Court to assert general jurisdiction over defendants Belatti and BCG.

### D. Constitutional Fairness

Because the Court fails to find that the exercise of either specific or general jurisdiction would be proper, the Court does not have "to determine whether exercise of personal jurisdiction would comport with notions of fair play and substantial justice." *Ham,* 4 F.3d at 416, n. 15. *See also Spademan,* 772 F.2d at 1194, n. 7.

### II. Failure to State a Claim

In view of the Court's ruling as to *in personam* jurisdiction, the Court does not reach the question of whether plaintiffs' complaint fails to state a claim against Belatti and/or BCG.

### III. Conclusion

Plaintiffs try to assert specific personal jurisdiction over defendants Belatti and BCG on the basis that their efforts as to the reorganization plan of ACE, a Texas corporation whose bankruptcy was in Texas but which was headquartered in Louisiana, are directly related to broken promises made by Belatti and/or BCG in Georgia or Texas with effects in Michigan. Based on the facts before it, the Court finds that plaintiffs' attempt falls well short of what is required by due process. Additionally, the Court finds that the contacts between Belatti and/or BCG and Louisiana are not so "continuous and systematic" as to assert general jurisdiction over defendants.

Accordingly,

**39.** Plaintiffs argue that this doctrine is much criticized, citing *Rice v. Nova Biomedical Corp.,* 38 F.3d 909, 912 (7th Cir.1994), but plaintiffs overlook the fact that *Spademan* is the law in this Circuit. Moreover, under *Spademan,* there has been no showing by plaintiffs such that the Court should "disregard the corporate entity [*i.e.,* AFC] ... on the theory that the individual or subsid-

iary is the alter ego of the corporation" or a facade. *Spademan,* 772 F.2d at 1198–99.

**40.** The Court also notes that, even on the basis of the defendant's many contacts with the forum state in *Holt,* the Fifth Circuit termed the issue of whether to assert general jurisdiction a "close" one. *Id.*

IT IS ORDERED that the "Motion of Frank J. Belatti and Belatti Consulting Group, Ltd. to Dismiss the Complaint" is GRANTED.

IT IS FURTHER ORDERED that plaintiffs' claims against Frank J. Belatti and Belatti Consulting Group, Ltd., be DISMISSED WITHOUT PREJUDICE.